**GILES AND THOMPSON LAW, PLLC**
Chip D. Giles, ISB #9135
Jason S. Thompson, ISB #8985
350 N. 9th Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 342-7880
Facsimile: (208) 947-2424
Email: chip@gtidaholaw.com
          jason@gtidaholaw.com


**THE WEISER LAW FIRM, P.C. (application for *pro hac vice* to be filed)**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062


**RM LAW, P.C.  (application for *pro hac vice* to be filed)**
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305


*Counsel for Plaintiff*

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 1 -

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| KAREN SBRIGLIO, derivatively on behalf of MICRON TECHNOLOGY, INC., | : : : | Civil Action No. |
| Plaintiff, | : : : | |
| v. | : : : | |
| SANJAY MEHROTRA, DAVID A. ZINSNER, ROBERT E. SWITZ, ROBERT L. BAILEY, RICHARD M. BEYER, PATRICK J. BYRNE, ERNEST E. MADDOCK, MERCEDES JOHNSON, MARK DURCAN, and LAWRENCE N. MONDRY | : : : : : : : : | **VERIFIED   COMPLAINT   AND DEMAND FOR JURY TRIAL** |
| Defendants, | : : : | |
| and | : : | |
| MICRON TECHNOLOGY, INC., | : : : | |
| Nominal Defendant. | : : | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Karen Sbriglio ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Micron Technology, Inc. ("Micron" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from November 2015 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Micron is in the business of innovative memory and storage solutions.  Micron manufactures memory chips for computers, smartphones, servers, and similar end products. Most of the Company's revenue is generated from dynamic random

access memory ("DRAM") products. Micron is one of three dominant players in the DRAM market, along with Samsung Electronics ("Samsung") and SK Hynix ("Hynix"), that collectively account for 95% of sales. In addition, Micron's most important market is China.  The Company employs more than 34,000 team members, in 17 different countries.

3.      During the Relevant Period, and unbeknownst to investors, Defendants (defined herein) misled the public by failing to disclose to investors that they had caused the  Company to engage in a price-fixing conspiracy with would-be competitors Samsung and Hynix, and that such unlawful behavior could lead to severe sanctions against Micron, in China and elsewhere. Instead, Defendants repeatedly referred to Samsung and Hynix as competitors who could have "cost advantages."  These supposed competitors collectively agreed not to increase DRAM supply capacity in response to rising prices, but instead maintain supply discipline so as to perpetuate an undersupply of DRAM product. This anticompetitive conduct successfully caused DRAM prices to consistently rise from the middle of 2016 through the end of 2017.  In response to these rising prices, Micron's customers stockpiled DRAM product to mitigate against future price increases.

4.      DRAM is one of the most common forms of semiconductor memory.  DRAM is made from silicon wafers, and is widely used as a component in digital electronics, such as in mobile phones, PCs and servers, laptops, tablets, TVs, set-top boxes, cameras, and in industrial applications, such as in automotive, military, and aviation devices.  The three largest suppliers of DRAM, Samsung and Hynix, and Micron, control nearly 96% of the DRAM market.

5.      Prior to the start of the Relevant Period, Micron acted as a true competitor to Samsung and Hynix – competing on balance supply (and capacity) to meet industry demand for DRAM and seeking to gain market share though increases in their supply.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 3 -

6.     Micron, Samsung, and Hynix made a near simultaneous decision in 2016 to restrict growth in the supply of DRAM to stop the downward pressure on prices and, indeed, to cause DRAM prices to skyrocket upward.  Defendants accomplished this by publicly calling on Samsung and Hynix to engage in supply discipline.  For example, on March 30, 2016, Micron's former Chief Executive Officer ("CEO"), Mark Durcan ("Durcan"), was specifically asked whether Micron would engage in supply cuts and he responded that Micron would "be foolish to be the first ones to take capacity off."  Micron's former Chief Financial Officer ("CFO"), Ernie Maddock ("Maddock"), further confirmed that Micron would not unilaterally cut production: "***it's a really ill-advised move to be unilaterally cutting production.***"  But, at the same time, Defendants reassured competitors that ***"our focus is not on market share."***  This message was Defendants telling Micron's competitors that it would cease trying to take market share from Samsung and Hynix.  On April 28, 2016, Samsung responded to Micron's invitation to cut supply by publicly announcing that its DRAM supply growth had turned negative.  After these communications, by June 1, 2016, DRAM prices reversed course, started shooting upwards, and continued to do so throughout the Relevant Period.

7.     On May 15, 2018, the Chinese State Administration for Market Regulation ("SAMR") notified Micron that it was investigating potential collusion and other anticompetitive conduct by dynamic random access memory ("DRAM") suppliers in China.  On May 31, 2018, SAMR made unannounced visits to Micron's offices in Beijing, Shanghai, and Shenzhen to investigate these claims.

8.     Throughout the Relevant Period, Micron (as well as Samsung and Hynix) would publicly announce their intent to keep supply ***below*** demand – intentionally causing prices to rise while refusing to compete against one another.

9.      It was not until October 15, 2018 that Defendants revealed the SAMR investigation, by way of the Company's Form 10-K filing for the period ended August 30, 2018. This disclosure was not full and complete, however, as it did not reveal that there was "massive evidence" of Micron's anti-competitive behavior.

10.     On November 19, 2018, the *Financial Times* reported that investigators in China had "found 'massive evidence' of anti-competitive behaviour" by Micron and that Samsung and Hynix had engaged in a price-fixing conspiracy with Micron.

11.     On this news, Micron stock fell almost 8% to close at $36.12 on November 20, 2018.

12.     At the same time the Defendants were spreading misinformation to the market, several Company insiders profited personally by selling their personally held Micron stock.  In total, no fewer than four insiders sold over $9 million of their Micron stock during the Relevant Period while the Company's stock price was artificially inflated.

13.     Accordingly, as a result of Defendants' breaches, as set forth herein, the Company has been damaged.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to §27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1331.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

17.     Plaintiff is a current shareholder of Micron and has continuously held Micron stock since August 2015.

18.     Nominal defendant Micron is a Delaware corporation, with its principal executive offices at 8000 S. Federal Way, Boise, Idaho 83716. According to its public filings, Micron is in the business of innovative memory and storage solutions.

19.     Defendant Sanjay Mehrotra ("Mehrotra") has served as the Company's President, CEO and a director since May 8, 2017.

20.     Defendant David A. Zinsner ("Zinsner") has served as the Company's Senior Vice President and CFO since February 19, 2018.

21.     Defendant Robert E. Switz ("Switz") has served as the Chairman of the Board since 2012 and as a director of the Company since February 2006. In addition, defendant Switz

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 6 -

served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.

22.     Defendant Robert L. Bailey ("Bailey") has served a director of the Company since 2007.  In addition, defendant Bailey served as a member of the Audit Committee during the Relevant Period.

23.     Defendant Richard M. Beyer ("Beyer") has served as a director of the Company since January 2013.

24.     Defendant Patrick J. Byrne ("Byrne") has served as a director or the Company since April 2011.  In addition, defendant Byrne served as a member of the Audit Committee during the Relevant Period.

25.     Defendant Mercedes Johnson ("Johnson") served as a director of the Company from June 2005 until December 2018.

26.     Defendant Lawrence N. Mondry ("Mondry") served as a director of the Company from April 2005 until December 2018.

27.     Defendant Durcan served as the Company's CEO from 2012 until his retirement in February 2017.

28.     Defendant Maddock served as the Company's CFO from June 2015 to February 2018.

29.     Collectively, defendants Mehrotra, Zinsner, Switz, Bailey, Beyer, Byrne, Johnson, Maddock, Durcan and Mondry shall be referred to herein as "Defendants."

30.     Collectively, defendants Bailey, Byrne and Switz shall be referred to as the "Audit Committee Defendants."

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 7 -

## DEFENDANTS' DUTIES

31.     By reason of their positions as officers, directors, and/or fiduciaries of Micron and because of their ability to control the business and corporate affairs of Micron, Defendants owed Micron and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Micron in a fair, just, honest, and equitable manner.   Defendants were and are required to act in furtherance of the best interests of Micron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to Micron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     Defendants, because of their positions of control and authority as directors and/or officers of Micron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Micron, each of the Defendants had knowledge of material non-public information regarding the Company.

33.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Micron were required to, among other things:

> a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state

laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

34.   Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a.   Oversee and monitor the integrity of the Company's financial statements and the ***Company's compliance with legal and regulatory requirements***;

b.   Discuss with management the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing with the U.S. Securities and Exchange Commission ("SEC") the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively;

c.   Discuss with management significant financial reporting issues and judgments made in connection with the preparation of the Company's annual and quarterly financial statements, including any (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's internal controls, and (c) special steps adopted by the Company in light of identified material control deficiencies;

d.   Review with management the Company's disclosure controls, procedures and checklists, including compliance therewith, used in the preparation of the Company's report of financial results and operations;

e.   Review at least quarterly the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management;

f.   Review periodically, with the Company's Chief Compliance Officer or his designee, the Company's compliance with legal and regulatory requirements and legal matters that may have a significant impact on the Company's financial statements;

g.   Discuss guidelines and policies with respect to risk assessment and risk management and the steps management has taken to monitor and control such exposures, including exposure to major financial risk; and

h.   Discuss with management the Company's earnings press releases.

35.     Additionally, Micron has established a "Code of Business Conduct and Ethics" (the "Code of Conduct"), which states, *inter alia*:

> Acting ethically means that we must uphold our responsibility to follow all laws and regulations that apply to the work we do and to our location. We never violate any law—no matter how small.
>
> \*   \*   \*
>
> This Code applies to everyone who works on Micron's behalf worldwide, including team members (employees, officers and directors), temporary workers, vendors, suppliers and contractors. We are all expected to adhere to the standards contained in this Code.
>
> \*   \*   \*
>
> Under the FCPA, our books and records must accurately and fairly reflect our expenditures and other transactions. We are also required to keep a system of internal controls so we can provide honest financial statements and accurately account for our profits, losses, assets and liabilities.

## SUBSTANTIVE ALLEGATIONS

**A.    Company Background**

36.     Micron and its consolidated subsidiaries design, manufacture and sell high-performance memory and storage technologies, including DRAM and flash memory, used in products around the world, including in the United States.  Micron's technologies are used in a variety of markets including computing, networking, server applications, mobile, embedded, automotive and industrial designs.

37.     Micron was founded in 1978 as a semiconductor design company.  The Company grew significantly over the years as a result of a three-way merger, creation of two major joint ventures with Intel, and numerous acquisitions.  As of October 2018, Micron touted itself as "the touted world's fourth-largest semiconductor company, with the broadest portfolio of memory and storage solutions in the industry," employing over 34,000 people in 17 countries globally with nearly 40,000 patents contributed over the course of its 40-year history.

38.     A significant portion of Micron's wholly-owned facilities are located outside the U.S., in locations including Singapore, Taiwan, Japan, and China.  Micron also purchases a significant portion of its equipment and supplies from outside of the U.S. and many of its top customers are located outside the U.S.  In 2018, 88% of Micron's sales were to customers located outside the U.S. and 50% of Micron's revenue was generated by China.

39.     Since Micron became a publicly traded company in 1990, it has acquired numerous other corporations that design, manufacture and sell semiconductor, memory and flash products.  Several of those major acquisitions included Chinese and Japanese companies such as Inotera, Elpida Memory, and Powerchip.  By aggressively acquiring other large companies in its industry and integrating them into Micron's umbrella, the Company was able to consistently generate significant growth in sales.  Micron's acquisition strategy involved vertically integrating processes such as technology development, initial pilot line production, high-volume wafer manufacturing, and complex component assembly and test all in the same region. Micron's strategy was essentially to monopolize the industry.

40.     The market for Micron's key product, DRAM, has become increasingly consolidated over the years.  While in 1980 there were over 20 different suppliers of DRAM, now just three suppliers, including Micron, account for about 96% of the market share.  The market for DRAM is largely inelastic because there are no close substitutes for it.  It is very difficult for new entrants to succeed in the heavily consolidated DRAM market because its three main suppliers, including Micron, own the requisite intellectual property and DRAM development requires costly, large scale, specialized manufacturing processes.

41.     Up to two-thirds of Micron's revenues have come from DRAM, the biggest driver of its business.  The growth of the DRAM segment was fueled by demand from the cloud,

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 11 -

enterprise, mobile, and graphics end-markets. During its fiscal year 2018, Micron reported that sales of its DRAM products rose 64%, with average selling prices rising by 35% and volumes growing 20%.

42.     DRAM is one of the most common forms of semiconductor memory. DRAM is used to store bits of data in capacitors, which are situated within integrated circuits. DRAM is widely used in digital electronics, such as in mobile phones, PCs and servers, tablets, TVs, cameras, and also in industrial applications, such as in automotive, military and aviation devices.

43.     Micron manufactures DRAM in fabrication plants, commonly called "fabs." DRAM is made from silicon wafers, which are cut into individual chips called "dice," which are then printed with electronics. Capacity for DRAM is often discussed in terms of new "wafer starts."

44.     DRAM is classified into categories based on its end-use. For example, PC DRAM is used in PC-related products; mobile DRAM is used in mobile devices; and server DRAM is used in server applications.

45.     Micron sells the vast majority of DRAM to OEMs, which then incorporate DRAM into the manufacturing of DRAM-containing products. Micron primarily sells DRAM pursuant to contracts with DRAM buyers, with the remainder sold on the spot market.

46.     Micron is also increasingly reliant on its business in China. The Company's revenue from Chinese customers rose 67% in 2018 and accounted for 57% of its total sales, compared to 51% in 2017 and 43% in 2016.

**B.     Confidential Witnesses**[1]

---

[1]     There is currently a related securities class action against Micron and certain of the defendants named herein pending in the U.S. District Court for the Southern District of New York, captioned *In re Micron Technology, Inc. Securities Litigation*, Case No. 19 Civ. 678 (the "Securities Action"). On June 15, 2019, the plaintiffs to the Securities Action filed an Amended

47.     **Confidential Witness No. 1** ("CW1"): It has been alleged that CW1 was Micron's Corporate Vice President of global supply chain from August 2012 through June 2018. It has been further alleged that during the relevant time period, he reported to the Executive Vice President of worldwide operations, Manish Bhatia ("Bhatia"), who]]][ in turn reported to the CEO.

48.     **Confidential Witness No. 2** ("CW2"):  It has been alleged that CW2 was Micron's Vice President and Chief Strategist in the NAND solutions group from August 2013 through April 2015.

49.     **Confidential Witness No. 3** ("CW3"): It has been alleged that CW3 was Micron's Vice President of the storage business unit from March 2014 through August 2017.

50.     **Confidential Witness No. 4** ("CW4"):  It has been alleged that CW4 was employed by Micron in various roles from September 2005 through April 2018, including as a manager in Micron's operations project management office from May 2016 through April 2018.

51.     **Confidential Witness No. 5** ("CW5"): It has been alleged that CW5 was Micron's Senior Director of new production introduction from July 2016 through May 2018.

52.     **Confidential Witness No. 6** ("CW6"): It has been alleged that CW6 was employed by Micron in various roles from 1999 through February 2019, including as a Manager of global sales enablement from September 2016 through February 2019.

53.     **Confidential Witness No. 7** ("CW7"): It has been alleged that CW7 was a Deputy Director in Ministry of Commerce for the People's Republic of China ("PRC") until early 2019.

---

Consolidated Class Action Complaint (the "Securities Complaint").  While Plaintiff and her undersigned attorneys have conducted their own independent investigation of the wrongdoings alleged herein, the confidential witness ("CW") allegations herein are based upon allegations contained in the Securities Complaint.

C.      **Micron's Anticompetitive Conduct**

1.      **DRAM Market's Susceptibility to Collusion**

54.      The structure and characteristics of the DRAM market are conducive to collusive, anticompetitive behavior. The DRAM market has many of the key traits typically found in highly-cartelized markets, including: (1) DRAM is a commodity product—i.e., interchangeable with other goods of the same type.; (2) the DRAM market is highly concentrated; (3) the DRAM market has high barriers to entry; (4) demand for DRAM is inelastic—i.e., there are no close substitutes for DRAM products; and (5) the DRAM market experienced steep price increases that cannot be explained by rising costs or the introduction of new technologies.

55.      In the 1980s there were over 20 DRAM manufacturers.  By 2012, that number had fallen to fewer than 11 manufacturers. And by 2018, the industry had become dominated by three companies—Micron, Samsung, and SK Hynix—which collectively accounted for 96% of worldwide DRAM market share.  Micron by itself had a 23% market share, while Samsung had 46% and SK Hynix had 27%.

56.      Intellectual property poses a formidable barrier to entry for new market players. The DRAM industry is marked by a number of patents, a significant number of which are cross-licensed among Micron, Samsung, and SK Hynix. Their partnerships and alliances for technology and capacity help secure their market power and render market entry more difficult.

57.      There was also an ease of information sharing amongst the key players through an industry reporting mechanism, DRAMeXchange, and common participation in trade associations and other industry groups.

58.      From the middle of 2016 through the end of 2017, the primary types of costs that could have explained rising DRAM prices—namely, silicon wafer prices, research and

development costs, and capital expenditures—remained fairly stable.

59.     Although the introduction of a new technology can explain price increases, the current DRAM technology, DDR4 was well into its life cycle.  Because DDR4 was introduced in 2014, long before the price increases began in the middle of 2016, the transition from DDR3 to DDR4 cannot be used to explain the price increases.

**D.     Collusive Conduct by Micron, Samsung, and SK Hynix**

60.     Describing the DRAM industry, it has been alleged that CW3 stated that it was in the three main players' collective self-interest not to oversupply the market.  Each player had a huge financial motivation to get the other players not to add capacity. But this only happens by sharing information. There is an "unnatural balance of power" in the industry, creating "an almost unnatural desire to try to collaborate with your enemies."

61.     Global DRAM prices had been rising since June 2016 and continued to rise through the end of 2017 because supply grew well below demand. According to DRAMeXchange, the average selling price of DRAM increased by more than 40% from the beginning to the end of 2017.  However, Micron, Samsung, and SK Hynix were collectively restrained in making the capital expenditures to expand supply capacity, instead focusing their investments on technology transitions and process optimizations.

62.     Data from DRAMeXchange shows that, during the bull market, the top three suppliers each significantly increased their operating margins to 50-70%, the highest levels on record.  Moreover, for the first time, the profitability of DRAM exceeded that of application processors, a special kind of microprocessor that is more technically advanced than DRAM.

63.     From the middle of 2016 until the end of 2017, deviating from past business practices, Micron, Samsung, and SK Hynix, which collectively controlled approximately 95% of

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 15 -

the DRAM market, decided to limit capacity expansion such that supply grew more slowly than demand. As shown by their public statements throughout this period, the companies consistently signaled their joint agreement on this course of action.  As a result, from the middle of 2016 until the end of 2017, DRAM spot prices skyrocketed nearly 350%—unprecedented in the history of the industry.

64.     As DRAM prices escalated throughout 2017, Micron, Samsung, and SK Hynix maintained their collective supply and capacity discipline for purposes of keeping supply growth below the forecasted demand growth, which further fueled price increases.

65.     The supposed competitors reassured one another that they would avoid competing against each other for market share by maintaining an undersupply of DRAM.

66.     During Micron's earnings call for the third quarter of 2017 on June 29, 2017, Defendants stated that total DRAM bit growth "would be between 15-20%," which was below its view of demand growth.  Samsung and SK Hynix subsequently made similar statements that supply growth would be lower than demand growth.

67.     During an investor conference on August 7, 2017, Defendant Mehrotra reiterated Micron's view that industrywide DRAM bit supply would grow in the 15-20% range, as compared to demand growth exceeding 20%.

68.     During Micron's earnings call for the fourth quarter of 2017 on September 27, 2017, Defendant Mehrotra stated, "we intend to grow aligned with industry over the course of these multiyear periods."  Samsung and SK Hynix subsequently made similar statements that their supply growth would be in line with, or below, industry.

69.     After steadily falling for most of the past three decades, the price-per-bit of DRAM chips rose 47% in 2017.  As the three companies entered 2018, they sought to keep

prices at 2017 levels by keeping DRAM supply in check.   For example, according to TrendForce, wafer start volumes for the three companies was expected to expand only 5-7% in 2018.

### E.      China Investigation and Its Consequences

70.      China is the largest importer of memory products, consuming approximately 20% of the world's DRAM.   In addition, China is the biggest smartphone manufacturer.   Chinese OEMs were among the most negatively impacted by the DRAM price hikes because they operated at lower profit margins compared to their competitors.

71.      On December 22, 2017, the PRC National Development and Reform Commission ("NDRC") held a meeting with Samsung representatives.   During this meeting, the regulator expressed concerns about Samsung's role in the continuing price increases for memory products.

72.      It was reported that the meeting between the NDRC and Samsung was prompted by Chinese smartphone makers that were struggling under DRAM cost pressure.

73.      On December 26, 2017, Reuters reported that "China's economic regulator is paying close attention to a recent surge in the price of mobile phone storage chips and could look into possible price fixing by the firms that make them[.]"   Xu Xinyu, an official with the NDRC Pricing Supervision Department, was quoted in the state-run China Daily newspaper as saying that, "We have noticed the price surge and will pay more attention to future problems that may be caused by 'price fixing' in the sector."   According to the China Daily, "the official referred to possible coordinated action taken by a number of firms to gain maximum profits by pushing the price of the product as high as possible."

74.      It has been alleged that according to CW7, the PRC's State Administration for Market Regulation ("SAMR") separately initiated an investigation of Micron's anticompetitive

conduct at the beginning of 2018, seeking interviews with Micron personnel. After an initial round of interviews and discussions between Micron and SAMR, Defendants agreed to reduce Micron's prices as requested. Prices continued to increase, however. Defendants' failure to deliver on their promise, combined with their uncooperative and arrogant attitude, angered SAMR and led to its raid of the Company in May 2018.

75. In June 2018, it was reported that China had launched a probe into Micron, Samsung, and SK Hynix, specifically investigating price-fixing allegations. On June 1, 2018, Defendants issued a statement "confirm[ing] that China's State Administration for Market Regulation authorities visited Micron's China sales offices on May 31, 2018 seeking certain information." Samsung and SK Hynix also confirmed that the regulator had visited their offices.

76. As was reported later, there was massive evidence that Micron and its supposed competitors were engaging in anticompetitive conduct to artificially inflate DRAM prices.

77. Pursuant to Article 46 of the Anti-Monopoly Law of the People's Republic of China (effective August 1, 2008), the largest fine that Micron faces is 10% of its sales in China during the previous year.

78. As soon as China began to inquire into anticompetitive conduct, DRAM prices abruptly stopped its steep ascent in early 2018.

79. It has been alleged that CW2 stated that during a bull market—i.e., a time of rising prices—customers would purchase more inventory than they need, and when they start to expect prices to go down, they will cut back on the purchases to bleed off the excess inventory.

80. It has been alleged that CW4 similarly stated that when prices start to increase, end markets start to accumulate inventory to mitigate against paying higher prices later.

81. According to DRAMeXchange, server manufacturers had been aggressively

stocking up on memory products since the third quarter of 2017.  The server DRAM market had been experiencing rising prices as supply had been unable keep up with growing demand from the construction of data centers.

82.     Also according to DRAMeXchange, Chinese PC and server manufacturers responded to tight supply and rising prices by implementing cost control measures, which included aggressively stocking up on memory products since the third quarter of 2017.

83.     In May 2018, the same month that SAMR regulators raided Micron, it was reported that Samsung and HK Hynix were investing more than $35 billion to increase their memory manufacturing capacities. Industry analysts stated that the supply shortage could see improvement sometime in the second half of 2018.

84.     Throughout 2017, there were consistent reports of a worldwide memory shortage and speculation as to whether Micron, Samsung, and SK Hynix were unable to unwilling to keep up with demand. This news affirmed that they were unwilling—that is, until China began to investigate anticompetitive conduct.

85.     In the first half of 2018, while DRAM contract prices continued to rise, spot prices began to fall.  By June 2018, spot prices fell below contract prices, which is an early indicator of a possible overall DRAM price decline.

86.     By the end of August 2018, the added supply capacity expected in late 2018, combined with slowing demand, was expected to result in DRAM transitioning very quickly from shortage to oversupply.

87.     After price growth for nine consecutive quarters, DRAM prices began to weaken in the third quarter of 2018.

88.    As DRAMeXchange stated in September 2018, "[a]lthough end-product manufacturers as a whole are seeing a gradual drop in their DRAM inventories after posting shipment growths in this year's first half, they are also noticing that the supply situation in the DRAM market is shifting from tight to loose." Consequently, equipment manufacturers did not see any urgency to replenish their DRAM inventory as supply expanded.

89.    The industry suddenly had a global glut of DRAM products.

**F.    Weakening Demand in 2018**

90.    Internally, based on information obtained from its customers, Defendants saw that the market demand for the Company's DRAM products was weakening in 2018.  In particular, thanks to China's regulatory actions, the collusive behavior of Micron, Samsung, and SK Hynix had been broken, leading to expanding capacity and moderating prices. Therefore, given the outlook of moderating or even declining prices, Micron's customers no longer saw the need to accumulate DRAM inventory. What was a supply shortage very quickly became an inventory glut.

91.    It has been alleged that CW1 stated that Defendants gauged customer demand by examining many different signals from customers, analysts, and Micron's own inventory. Among other things, Defendants analyzed customer data triangulated with industry data.  Micron also assessed demand through customer meetings, during which a customer would indicate how much inventory it currently had and whether it intended to pull back or buy more product. Certain customers anecdotally provided information regarding their inventories and projected inventories.

92.    It has been alleged that CW2 similarly stated that because Micron generally had tight relations with the procurement personnel of large customers, customers would anecdotally

inform Micron's account executives when they had accumulated excess inventory and intended to cut back on purchases.

93.     It has been alleged that CW3 stated that Micron had a group within the sales department that sought to track customers' inventory to the extent possible.

94.     It has been further alleged that CW4 also stated that Micron had a team dedicated to obtaining inventory data from customers.

95.     Furthermore, it has been alleged that CW6 stated that Micron's many customers submitted forecasts on a monthly basis.  If Micron was not receiving strong forecasts from customers, that signaled demand was light or there is a build-up of inventory. Also, according to CW6, during 2018, the information communicated across the board was that the market was softening.

96.     It has been alleged that during the Relevant Period, CW1 attended a weekly staff meeting led by Bhatia, the Executive Vice President of worldwide operations, who reported directly to the CEO.  These staff meetings involved Bhatia's direct reports, including the heads of global operations and global quality.  One purpose of the meeting was to assess the buying patterns and demand of Micron's customers.  It has been alleged that by the time CW1 left Micron in June 2018, the Company's management was aware of a weakening market and that demand was dropping off.  Among other things, data showed a softening of the market during the second quarter of 2018.

97.     It has been alleged that during the relevant time period, CW5 attended regular meetings to discuss marketing and prepare manufacturing plans.  It has neem further alleged that by the time CW5 left Micron in May 2018, CW5 participated in discussions among the Company's management that customer inventory was building and that they could see the

market softening.

### G.    Defendants' False and Misleading Statements

98.    Defendants regularly (and falsely) represented during the Relevant Period that Micron was compliant with all legal and regulatory requirements. Specifically, Defendants regularly represented that Micron's industry was highly competitive.

99.    On November 17, 2015, at the UBS Global Technology Conference, Maddock emphasized to investors that the DRAM industry was characterized by high market concentration with significant barriers to entry: "we do believe that from a market perspective, we're in an environment where you have closely held technology by a very limited number of producers." Defendants forecast that Micron's competitors would make some "really rational decisions" involving "lower supply growth" and no "significant DRAM capacity expansion."

100.    On March 7, 2016, Maddock again reassured investors at the Raymond James Institutional Investors Conference that Micron's competitors were now not competing for market share and were instead focused on profitability:

> "So the question was that there are Taiwan or Korean entities bidding for share i.e. causing our pricing environment to be different than it otherwise would be. You know, honestly we're not seeing that. . . . So obviously if you have folks look to the Koreans and if you actually look at some of the public commentary they have made with respect to the business environment they see, the focus on profitability and *as we look at market behavior it is not consistent with any sort of deliberate attempt to take share*, but so that's what we are seeing.[2]

101.    On March 30, 2016, Durcan, at the second quarter of 2016 earnings call, in response to investor analyst questions about potential supply cuts, publicly stated that Micron would be willing to cut supply if its competitors also cut supply:

> "Q: Pricing is going to continue to be weak until Micron and the DRAM industry overall cuts production. So, I guess, my question is, what will it take for that to happen?

---

[2]    Unless otherwise noted, all emphasis is added.

A: We don't have any plans that cut production to date.

*Q: I mean is your point that it's got to come from the market share leader first?*

*A: … we think we'd be foolish to be the first ones to take capacity off."*

102.     Maddock further confirmed that Micron would not unilaterally cut production: "***it's a really ill-advised move to be unilaterally cutting production.***"  On the same call, Durcan emphasized that Micron would not try to take market share from its competitors: "***Our focus isn't on market share***.  Our focus is on making sure that we've deployed equivalent advanced technology, at least equivalent advanced technology to our competitor, so that we're not incentivizing others to play for market share."

103.     On May 25, 2016, Durcan stated at the J.P. Morgan Global Technology, Media and Telecom Conference that supply growth for the next year would be around 20 percent "as long as nobody adds any incremental DRAM wafers," and that "if wafers actually come down as we're starting to hear some equipment suppliers talk about, then it could be mid- to high-teens, in which case that would be more beneficial."   Durcan explained that there are only three suppliers in the market, and "***we all are going to either benefit or be hurt by excess supply in the marketplace.***"  Durcan further stated that he expected "slowing bit growth" in the industry and that he expected Micron and its competitors to maintain discipline:

> "there's a natural tightening tendency absent, somebody wanting to do something different than that. And so I'm – I actually remain bullish on the long term value, the DRAM business and the actions of the competitors in the marketplace. …at least thus far many of the public comments that have been made, a lot of which have been made by the equipment companies collaborate ***this idea that there is a general reduction in DRAM CapEx planned by our Korean competitors and that we believe is very consistent with other messages that we're hearing in the marketplace***. So am I concerned? We're always concerned. Do we believe that that disruptive behavior is a high likelihood? It just doesn't feel as if that's the case right now."

104.     These statements constituted a clear signal to Samsung and Hynix that while

Micron would not unilaterally cut production, if either Samsung or Hynix cut production, Micron would not try to take market share in response. That is exactly what happened.

105. From that month in June 2016, and through the end of 2016, **_DRAM prices increased by 50 percent_**. Yet, unexpectedly absent coordination, during this timeframe Micron, Samsung, and Hynix each kept supply bit growth restrained by avoiding adding significant wafer capacity. At the same time, industry participants, led by Micron, began to coordinate for 2017 on a plan of keeping **_supply bit growth below forecasted demand growth._**

106. On October 28, 2016 Defendants caused Micron to file with the SEC its annual report on Form 10-K for the year ended September 1, 2016 (the "2016 Form 10-K"), signed by defendants Durcan, Maddock, Bailey, Beyer, Byrne, Johnson, Mondry, and Switz, which stated in pertinent part:

> We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants.
>
> Our competitors seek to increase silicon capacity, improve yields, reduce die size, and minimize mask levels in their product designs resulting in significant increases in the worldwide supply of semiconductor memory and downward pressure on prices. Increases in worldwide supply of semiconductor memory also result from semiconductor memory fab capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to or are constructing or ramping production at new fabrication facilities. Increases in worldwide supply of semiconductor memory, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. Many

of our high-volume memory products are manufactured to industry standard specifications and as such have similar performance characteristics to those of our competitors.

For these high-volume memory products, the principal competitive factors are generally price and performance characteristics including: operating speed, power consumption, reliability, compatibility, size, and form factors. For our other memory products, the aforementioned performance characteristics generally take precedence over pricing.

107. These representations were made regularly by Defendants in Company filings with the SEC during the Relevant Period.

108. In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2016 Form 10-K contained signed certifications ("SOX Certifications") by defendants Durcan and Maddock, stating that the financial information contained in the 2016 Form 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed. The SOX Certifications set forth:

I, [D. Mark Durcan/Ernest E. Maddock], certify that:

1. I have reviewed this Annual Report on Form 10-K of Micron Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*   *   *

I, [D. Mark Durcan/Ernest E. Maddock], certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Micron Technology, Inc. on Form 10-K for the period ended August 30, 2018, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 26 -

Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Micron Technology, Inc.

109.    In December 2016, with DRAM prices rising, Defendants twice affirmed that Samsung had changed its behavior.   On December 7, 2016, Maddock publicly stated at the Barclays Technology Conference that when the industry added DRAM capacity in 2014, that was the last time "supply came into the industry and that there was a new fab that was brought online by one of our competitors [Samsung]."   Maddock lamented that those capacity additions had put "pricing pressure on the [DRAM] business" but that things were now different because "with the absence of capacity additions" in 2016 "now you're back into this fundamentally healthier period."

110.    On December 21, 2016, Defendants, on Micron's first quarter 2017 earnings call, again signaled that Micron and its competitors had learned their lesson, and that this time – in the midst of the rising prices and steady demand – neither party would be adding supply as they did in 2014. In answering a question as to why the current period would be different for the industry than what occurred in 2014, Maddock responded that in 2014 there was a "little bit of a miscalculation by one of the suppliers." Maddock stated that he understood that Samsung had "learned from" that "miscalculation."

111.    On May 24, 2017, Maddock reassured industry analysts at the JP Morgan Global Internet, Media and Technology Brokers Conference that Micron and its competitors – unlike previous years – were being careful not to add supply: "if you listen to the commentary coming from industry participants on the supply side it reflects a great deal of discipline and thoughtfulness with respect to how the industry participants are considering supply expansion… Although we don't speak for the industry, the other participants have spoken and indicated a great deal of discipline."

112.    At the same event, Defendants made announcements on supply growth that matched those of Micron's competitors the previous month and affirmed the industry consensus of growing supply 15- 20%: *"on the DRAM side you're going to see somewhere between 15% and 20% growth in bits supplied, that's something that the other suppliers in the market are also saying, within reasonable range."*

113.    Defendants emphasized that Micron's plans to not add wafer capacity in 2017 were consistent with that of Samsung and SK Hynix and would allow each participant to maintain supply growth between 15-20%:

> "Q: their view was, exiting this year, industry capacity is probably flat. And I don't know *if you have a view on total industry capacity dynamics, and your sense of where that could be exiting this year?*
>
> *A: I think that's reasonably consistent with certainly what we've said about our intent, and then certainly the public comments of the other industry participants have been pretty much exactly that.* That while you do get some wafer loss as a result of technology transitions, the intent that we have is to maintain flat wafer outs, so essentially you are adding a little bit of capacity to make up for those lost wafer outs, but as an industry as a whole, you are not adding substantial incremental industry wafers and that would contribute to or allow you to get into this 15% to 20% range in terms of bit growth."

114.    On June 6, 2017, Maddock, yet again, reiterated at the Bank of America Merrill Lynch Global Technology Conference that the industry was systematically keeping supply growth constrained at 15-20% even as DRAM demand grew 20-25% on a yearly basis:

> "So, on DRAM, we have been saying for some time that we thought that from a demand perspective, that demand was going to be somewhere in the range of 20% to 25% year-on-year bit growth. And in fact, we feel that's a reasonable estimate to use for the next few years at least out as far as we would think about and model the business. And then from a supply side, we think that even with some very modest wafer additions by the industry essentially keeping wafer output flat in the face of declining bits coming simply from technology transition that aggregate bit growth from a supply point of view is going to be somewhere in the range of 15% to 20%."

115.    Maddock emphasized that the three industry participants who controlled the

market could maintain this supply shortfall if they remained disciplined about not adding supply:

> "it feels as very much as if you'll have good balance between supply and demand as long as capital discipline is exercised. And *certainly Micron has indicated the difference to be reasonably disciplined with its capital investments, and other industry competitors in their particular public disclosure have said similar things.*"

116.    Defendants' comments in response to questions explicitly suggested interdependent action where each of the three DRAM suppliers agreed not to add supply capacity despite rapidly increasing DRAM prices:

> "Q: Maybe another way looking at the overall of the DRAM industry today's margins very high, so that could be sort of the temptation for your competitors because this is borrowing cost very low, right…don't you expect any competitors tend to irrationally backing on the better, cyclical momentum?
>
> A: *I can say our view of industry bit demand will have to be materially different than in the peers to be today to begin to have a think about expanding capacity* well beyond where we are thinking today which is predominantly to get that capacity through technology transition… *I don't think our view of how we look at the industry is very-very different then how other rational smart people sitting and other competitors tend to look at the industry."*

117.    On June 8, 2017, Maddock again reaffirmed at the Robert W. Baird Global, Consumer, Technology Conference that each of the three DRAM manufacturers were refusing to add wafer capacity in the face of rapidly rising DRAM prices:

> "[T]here has actually been much more disciplined behavior on the part of the remaining industry participants, of which there are now only 3, it's Micron, Samsung and Hynix. And so while each of us is assessing the market, looking at the market, *I think there's great consistency between suppliers relative to our view of market growth opportunities on the demand side. And what you see being exercised today is disciplined investment around expansion of capacity relative to expansion of demand.* And each one of us has made our own independent comments on what we think makes sense for our particular company. In Micron's case, we said that we have no plans for additional new wafer fab capacity that we will get the bits that we require to serve the market from technology transitions."

118.    Throughout this quarter, DRAM prices continued to rapidly rise. Yet, the supply discipline remained strong as each of the three competitors kept supply growth below demand growth, only further fueling the price increases.  The competitors also ***publicly reassured each other that they would avoid competing against each other for market share.***

119.    On June 29, 2017, Defendants, on Micron's third quarter 2017 earnings call, reaffirmed that the total DRAM industry bit growth ***"would be between 15-20%....below our view of demand growth"*** despite rapidly rising DRAM prices.  Defendants then strongly reiterated that Micron had no plans to add wafer capacity. Micron's investors even questioned Maddock closely on whether its plans to limit supply growth would not cause a loss of market share that led to profit loss:

> "Q: Could you help us just kind of frame, is there enough sort of mix up opportunity during the first half '18 where even though you might be losing some bit share, you might not be losing sort of profit share in the industry?
>
> A:..we talked about our bit growth in context of an industry that we were estimating. But we also used the words at or slightly below, not materially below."

120.    While Defendants were emphasizing the disparity between supply and demand, Hynix and Samsung were using the same metrics, and the same business strategy.  On July 25, 2017, Hynix told investors on its second quarter 2017 earnings call that its DRAM shipment growth for the year would be "at low 20%, on par with the market."  Samsung, two days later on July 27, 2017, stated that it too was forecasting its bit growth to be in the high teens, and that Samsung expected "our bit growth to be in line with the market."

121.    Defendant Mehrotra, within two weeks of the public comments of Samsung and Micron, confirmed on August 7, 2017, at the KeyBanc Capital Markets Annual Global Technology Leadership Forum Conference that each of the three competitors were taking the

same, interdependent approach to bit supply growth – maintaining it below 20% even as demand

growth exceeded 20%:

> "Q: Have you -- either of you've seen any changes in the market with respect to recent commentary and related to what Samsung or Hynix said on the earnings calls in terms of bit supply that would be of any concern or CapEx plans that would be of any concern?
>
> A: *I think overall bit supply in the industry is in 15% to 20% range*. And when you look at the bit supply growth perhaps, may be little bit toward the higher end of that 15% to 20% range. But, *the demand projection, again, from all the mega markets that I earlier talked about, point to greater than 20% demand for the industry*. So, I do believe that for 2017 and heading into 2018 as well, the industry fundamentals will be healthy."

122.    Mehrotra also emphasized that Micron, Samsung, and Hynix controlled 95% of

the DRAM market: "95% of the industry is supplied by three players, and Micron has a solid

position in the DRAM industry. So, that's a great position to be in."

123.    On September 26, 2017, Defendants issued a press release announcing the

Company's fourth quarter and full-year 2017 financial results (the "2017 4Q Release").

Defendants reported quarterly revenues of $6.14 billion, 91% higher compared with the prior

year quarter, and full-year revenues of $20.32 billion, 64% higher compared with the prior fiscal

year.  Defendant Mehrotra was quoted as saying, "Micron delivered exceptional fourth quarter

and fiscal year results, reflecting solid execution and robust demand for our memory and storage

solutions."  The 2017 4Q Release also reported that DRAM sales volumes for the quarter were

5% higher and that DRAM average selling prices for the quarter increased 8%.  Micron's overall

consolidated gross margin of 50.7% for the quarter was reportedly higher compared to 46.9% in

the previous quarter due to expansion of margins for DRAM products.

124.    The next day, on September 27, 2017, during the fourth quarter 2017 earnings call

Defendants reassured investors that they expected the "industry to remain moderately

undersupplied for the rest of 2017 for … DRAM."  Defendant Maddock told investors that the Company would not grow its supply capacity faster than that of industry participants and thus would maintain the industry consensus:

> "Q: [A]t what point, do you think you begin to start to outgrow bits relative to the industry for [DRAM]?
>
> A: I would also tell you that our objective over a multiyear period is to grow at about industry levels… ***really important is the segment that we intend to grow aligned with industry*** over the course of these multiyear periods." Despite undersupply in the DRAM market, Micron stated that it intended for its DRAM bit growth for 2018 to "be slightly below the industry growth rate."

125.    On October 26, 2017, Defendants caused the Company to file its annual report on Form 10-K for the period ended August 31, 2017 (the "2017 Form 10-K"), signed by defendants Mehrotra, Maddock, Bailey, Beyer, Byrne, Johnson, Mondry and Switz.  In addition to reporting the revenue figures stated above, the 2017 Form 10-K disclosed that more than half of the Company's $20.32 billion of total revenues, $10.39 billion, were generated in China, and that well more than half of its total revenues, $12.96 billion, were generated from DRAM sales.

126.    Addressing the operating results for the Company's DRAM segment, the 2017 Form 10-K stated:

> Strong conditions in 2017 for enterprise, client, mobile, graphics, and networking markets as well as key customer qualifications drove increases in sales volumes and prices as compared to 2016. The reductions in cost for 2017 and 2016 as compared to prior years were primarily due to improvements in product and process technology. For 2017 compared to 2016, lower depreciation due to the change made in the fourth quarter of 2016 in estimated useful lives for equipment at our DRAM wafer fabrication facilities contributed to cost reductions.
>
> Our gross margin percentage on sales of DRAM products for 2017 improved from 2016 primarily due to manufacturing cost reductions, increases in average selling prices, and shifts in product mix, while our gross margin percentage for 2016 declined as compared to 2015 as decreases in average selling prices outpaced manufacturing cost reductions.

127.    Under the section titled "Competition," the 2017 10-K stated:

Our competitors generally seek to increase silicon capacity and bits per wafer, which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage products also result from capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures or increase capacity at existing or new facilities, resulting in future increases in worldwide supply. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to declines in average selling prices for our products and materially adversely affect our business, results of operations, or financial condition.

128.    Under the section titled "Risk Factors," the 2017 10-K stated:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

129.    Also under the section titled "Risk Factors," the 2017 10-K stated:

**We have experienced volatility in average selling prices for our semiconductor memory and storage products which may adversely affect our business.**

We have experienced significant volatility in our average selling prices, including dramatic declines, as noted in the table below and may continue to experience such volatility in the future. In some prior periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Decreases in average selling prices for our products that decline faster than our costs could have a material adverse effect on our business, results of operations, or financial condition.

130.    In addition, the 2017 Form 10-K contained SOX Certifications, signed by defendants Mehrotra and Maddock, which were substantially similar to those set forth above.

131.    Maddock confirmed on December 6, 2017 at the Nasdaq Investor Conference that the industry planned to keep wafer capacity flat for several years despite rapidly rising DRAM prices: "We are not adding wafers for either technology in 2017. I think if you look at the public comments of other suppliers they are adding marginal numbers of wafers. But *essentially if you look at the industry in aggregate even at the end of 2018 it's altogether possible for DRAM that the number of wafers the industry produces is the same or slightly less than it was some years ago*."

132.    At the same conference, Maddock flatly stated that Micron and its competitors shared a common agreement to constrain DRAM supply: "*if you look at the public commentary of all the industry participants…I think there is a general belief that the industry participants are keenly aware of the fact that the DRAM market is relatively inelastic and the way you serve that market is by making sure there is adequate, but not excess supply*."

133.    On December 7, 2017, Defendants caused the Company to file its 2017 Proxy Statement with the SEC.  Defendants Bailey, Beyer, Byrne, Johnson, Mehrotra, Mondry, and Switz solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 34 -

134.    The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board of Directors has adopted a Code of Business Conduct and Ethics that is applicable to all our directors, officers and employees."

135.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Defendants, and the Defendants' failures to report violations of the Code of Conduct.

136.    Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "promote [the Company's] long-term success and shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

137.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

138.    On December 19, 2017, Defendants caused the Company to issue a press release announcing its first quarter 2018 financial results (the "2018 1Q Release"). Defendants reported quarterly revenues of $6.80 billion, 71% higher compared with the prior year quarter. Defendant

Mehrotra was quoted as saying, "Micron's strong results were driven by double-digit sequential revenue growth in mobile, server and SSD applications, with expanded gross margins and improved profitability."

139.    The 2018 1Q Release also reported that: "Revenues for the first quarter of 2018 were 11 percent higher compared to the fourth quarter of 2017, reflecting increased demand for our mobile, server, and SSD products.  Our overall consolidated gross margin of 55.1 percent for the first quarter of 2018 was higher compared to 50.7 percent for the fourth quarter of 2017 and reflects margin expansion for both DRAM and Trade NAND products supported by ongoing strength in the pricing environment and a favorable product mix."

140.    On December 20, 2017, Defendants caused the Company to file its quarterly report on Form 10-Q for the period ended November 30, 2017 (the "2018 1Q 10-Q"), signed by defendant Maddock.  In addition to reporting the revenue figures stated above, well more than half of the Company's $6.80 billion of total revenues, $4.56 billion, were generated from DRAM sales.

141.    Addressing the operating results for the Company's DRAM segment, the 2018 1Q 10-Q stated:

> Increases in sales volumes and prices in the first quarter of 2018 as compared to the fourth and first quarters of 2017 resulted from strong conditions for mobile, enterprise, client, and graphics markets driven by seasonal demand for client PCs, solid acceptance of new flagship smartphones, and ongoing strength from servers, particularly in cloud and hyperscale data centers. Our gross margin percentage on sales of DRAM products for the first quarter of 2018 improved from the fourth and first quarters of 2017 primarily due to increases in average selling prices and manufacturing cost reductions.

142.    The 2018 1Q 10-Q also included substantially similar paragraphs under the section titled "Risk Factors" as set forth above.

143.    In addition, the 2018 1Q 10-Q contained SOX Certifications, signed by

defendants Mehrotra and Maddock, which were substantially similar to those set forth above.

144.    DRAM prices continued to climb, and then abruptly stopped in early 2018, just after one of China's antitrust regulators, the National Development and Reform Commission ("NDRC"),[3] announced that it had begun an investigation into the DRAM industry due to the noticeable and sharp rise in the price of DRAM over the 18-month period from June 2016 to December 2017.

145.    On December 27, 2017, a *Reuters* article reported that the NDRC was investigating possible price-fixing in the DRAM market. *Reuters* reported that the investigation was looking into possible coordinated action taken by "a number of firms to gain maximum profits by pushing the price of the product as high as possible.  A 'super cycle' of tight supply and soaring demand for memory chips, which power servers and smartphones, has been driving up prices and profits at chipmakers such as Samsung Electronics Co., Ltd. And SK Hynix, Inc. which control the lion's share of the global market."

146.    On March 22, 2018, Defendants issued a press release announcing the Company's second quarter 2018 financial results (the "2018 2Q Release").  Defendants reported quarterly revenues of $7.35 billion, 58% higher compared with the prior year quarter.  Defendant Mehrotra was quoted as saying, "Micron executed exceptionally well in the second quarter, delivering record results and strong free cash flow driven by broad-based demand for our memory and storage solutions. Our performance was accentuated by an ongoing shift to high-value solutions as we grew sales to our cloud, mobile and automotive customers and set new records for SSDs and graphics memory."

147.    On March 23, 2018, Defendants caused the Company to file its quarterly report

---

[3]    In March 2018 the SAMR took over antitrust responsibilities in China from the NDRC and other agencies.

on Form 10-Q for the period ended March 1, 2018 (the "2018 2Q 10-Q"), signed by defendant Zinsner.  In addition to reporting the revenue figures stated above, well more than half of the Company's $7.35 billion of total revenues, $5.21 billion, were generated from DRAM sales.

148.    Addressing the operating results for the Company's DRAM segment, the 2018 2Q 10-Q stated:

> Increases in sales volumes and prices for the second quarter of 2018 as compared to the first quarter of 2018 and second quarter of 2017 resulted from strong conditions for server, mobile, and client markets. Our gross margin percentage on sales of DRAM products for the second quarter of 2018 improved from the first quarter of 2018 and second quarter of 2017 primarily due to increases in average selling prices due to favorable market conditions and manufacturing cost reductions.

149.    The 2018 1Q 10-Q also included substantially similar paragraphs under the section titled "Risk Factors" as set forth above.

150.    In addition, the 2018 1Q 10-Q contained SOX Certifications, signed by defendants Mehrotra and Zinsner, which were substantially similar to those set forth above.

151.    On June 20, 2018, Defendants issued a press release announcing the Company's second quarter 2018 financial results (the "2018 3Q Release").  Defendants reported quarterly revenues of $7.80 billion, 40% higher compared with the prior year quarter.  Defendant Mehrotra was quoted as saying, "We strengthened our competitive position and grew our revenue across virtually all of our high-value product segments.  We set new records for revenue in SSDs, Mobile Managed NAND and Automotive solutions along with Cloud/Enterprise and Graphics DRAM Memory.  We see ongoing momentum and healthy industry fundamentals in the fourth quarter to close out an exceptionally strong fiscal 2018."

152.    On June 22, 2018, Defendants caused the Company to file with the SEC its quarterly report on Form 10-Q for the period ended May 31, 2018 (the "Form 10-Q 3Q18"), signed by Zinsner.  In addition to reporting the revenue figures stated above, well more than half

of the Company's $7.80 billion of total revenues, $5.54 billion, were generated from DRAM sales.

153.    Addressing the operating results for the Company's DRAM segment, the 2018 2Q 10-Q stated:

> Increases in DRAM product revenue for the third quarter of 2018 as compared to the second quarter of 2018 resulted from strong market conditions, particularly for high-value cloud and enterprise server markets. Increases in DRAM product revenue for the third quarter and first nine months of 2018 as compared to the corresponding periods of 2017 resulted from strong conditions across key markets, particularly for cloud, enterprise, mobile, and graphics markets. Our gross margin percentage on sales of DRAM products for the third quarter and first nine months of 2018 improved from the second quarter of 2018 and corresponding periods of 2017 primarily due to strong demand as a result of favorable market conditions, shifts in mix to higher value markets, and manufacturing cost reductions resulting from strong execution on our implementation of new technology.

154.    The Form 10-Q 3Q18 also stated, in pertinent part:

> On April 27, 2018, a purported class-action lawsuit was filed against Micron and other DRAM suppliers in the U.S. District Court for the Northern District of California asserting claims based on alleged price-fixing of DRAM products during the period from June 1, 2016 to February 1, 2018. Similar cases were subsequently filed in Canadian courts in Quebec, Montreal and Toronto, Ontario. The complaints seek treble monetary damages, costs, interest, attorneys' fees, and other injunctive and equitable relief. We are unable to predict the outcome of these matters and therefore cannot estimate the range of possible loss. The final resolution of these matters could result in significant liability and could have a material adverse effect on our business, results of operations, or financial condition.

*     *     *

> **We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation**. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result

of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. The activities by the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. **If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.**

155.    However, the Form 10-Q 3Q18 failed to disclose that Micron had been engaged in anti-competitive behavior, and that there was "massive evidence" of Micron's anti-competitive behavior.

156.    The Form 10-Q 3Q18 also included substantially similar paragraphs under the section titled "Risk Factors" as set forth above.

157.    In addition, the Form 10-Q 3Q18 contained SOX Certifications, signed by defendants Mehrotra and Zinsner, which were substantially similar to those set forth above.

158.    On September 20, 2018, Defendants issued a press release announcing the Company's fourth quarter and full-year 2018 financial results (the "2018 4Q Release"). Defendants reported quarterly revenues of $8.44 billion, 38% higher compared with the prior year quarter, and full-year revenues of $30.39 billion, 50% higher compared with the prior fiscal year.  Defendant Mehrotra was quoted as saying, "In the fourth quarter, we set revenue records

across all our major markets, from automotive and industrial to mobile and cloud datacenters. The secular and diversified growth drivers in our industry combined with accelerating pace of transformation of the new Micron form a tremendous catalyst for us to create enduring value for our customers and investors in 2019 and the years ahead."

159.    After the truth started to come to light, Defendants still failed to fully disclose their wrongdoing.  On October 15, 2018, Defendants caused the Company to file with the SEC its annual report on Form 10-K for the year ended August 30, 2018 (the "2018 Form 10-K"), signed by defendants Mehrotra, Zinsner, Bailey, Beyer, Byrne, Johnson, Mondry and Switz.  In addition to reporting the revenue figures stated above, the 2018 10-K disclosed that more than half of the Company's $30.39 billion of total revenues, $17.36 billion, were generated in China, and that well more than half of its total revenues, $21.23 billion, were generated from DRAM sales.

160.    Addressing the operating results for the Company's DRAM segment, the 2017 10-K stated:

> Strong conditions in 2017 for enterprise, client, mobile, graphics, and networking markets as well as key customer qualifications drove increases in sales volumes and prices as compared to 2016. The reductions in cost for 2017 and 2016 as compared to prior years were primarily due to improvements in product and process technology. For 2017 compared to 2016, lower depreciation due to the change made in the fourth quarter of 2016 in estimated useful lives for equipment at our DRAM wafer fabrication facilities contributed to cost reductions.

> Our gross margin percentage on sales of DRAM products for 2017 improved from 2016 primarily due to manufacturing cost reductions, increases in average selling prices, and shifts in product mix, while our gross margin percentage for 2016 declined as compared to 2015 as decreases in average selling prices outpaced manufacturing cost reductions.

161.    The 2018 Form 10-K contained nearly identical representations regarding "competition" as the 2016 Form 10-K even as it disclosed the SAMR investigation:

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 41 -

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. In addition, the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

*     *     *

On April 27, 2018, a purported class-action lawsuit was filed against Micron and other DRAM suppliers in the U.S. District Court for the Northern District of California asserting claims based on alleged price-fixing of DRAM products during the period from June 1, 2016 to February 1, 2018. Similar cases were subsequently filed in federal court in the United States, as well as in Canadian courts in Quebec, Montreal and Toronto, Ontario. The complaints seek treble monetary damages, costs, interest, attorneys' fees, and other injunctive and equitable relief. We are unable to predict the outcome of these matters and therefore cannot estimate the range of possible loss. The final resolution of these

matters could result in significant liability and could have a material adverse effect on our business, results of operations, or financial condition.

On May 15, 2018, the Chinese State Administration for Market Regulation ("SAMR") notified Micron that it was investigating potential collusion among DRAM suppliers in China. On May 31, 2018, SAMR made unannounced visits to our sales offices in Beijing, Shanghai, and Shenzhen to seek certain information as part of its investigation. We are cooperating with SAMR in its investigation.

162.    In addition, the 2017 10-K contained substantially similar statements about Risk Factors as the 2016 10-K.

163.    Further, the 2018 1Q 10-Q contained SOX Certifications, signed by defendants Mehrotra and Zinsner, which were substantially similar to those set forth above.

164.    The disclosures in the 2018 Form 10-K were not full and complete, however, as Defendants did not reveal that Micron had been engaged in anti-competitive behavior, and that there was "massive evidence" of Micron's anti-competitive behavior.

165.    Defendants' above statements during the Relevant Period were materially false and/or misleading because they failed to disclose to investors that: (1) the Company engaged in anticompetitive behavior, including artificially restricting supply growth of DRAM; (2) these anticompetitive efforts were reasonably likely to lead to regulatory scrutiny; (3) the Company's anticompetitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) ceasing collusive behavior would result in a moderating of prices, leading to customers to cut back on stockpiling and resulting in an inventory glut.

## H.    **The Truth Emerges**

166.    On September 6, 2018, securities analysts at Robert W. Baird & Co. ("Baird") significantly lowered its price target for Micron by 25%, stating that the Company was no longer a "top idea."   Among other things, Baird warned that the market cycle for both DRAM and

NAND were peaking. Also on September 6, 2018, a securities analyst at Morgan Stanley stated, "We recently met buyers and sellers of memory and believe that the 4Q outlook for server DRAM is worse than we previously expected along with the prospects for the rest of memory in 3Q."

167.    On November 18, 2018, the *Financial Times* published an article reporting that while Micron had revealed the investigation, albeit belatedly, Defendants had failed to disclose that the Company had actually engaged in anti-competitive behavior that the Chinese Government had found "massive evidence of." The *Financial Times* article stated, in pertinent part:

> Chinese investigators said they found "massive evidence" of anti-competitive behaviour by the world's top three makers of computer memory chips, in a probe that could exacerbate global trade tensions.
>
> *            *            *
>
> "The anti-monopoly investigation into these three companies has made important progress... [It] has yielded massive evidence," said Wu Zhenguo, head of China's anti-monopoly bureau under the State Administration for Market Regulation.
>
> *            *            *
>
> The three companies control as much as 95 per cent of the global market for dynamic random-access memory (DRAM) chips, which are widely used in computers and smartphones.
>
> After steadily falling for most of the past three decades, the price-per-bit of DRAM chips rose 47 per cent in 2017, according to the US research firm IC Insights, and has continued to increase this year.
>
> The Chinese investigation follows a class-action lawsuit in the US, lodged in April, which alleges that the three companies conspired to inflate DRAM prices. The companies are contesting the case.
>
> *            *            *
>
> In 2005, Samsung and Hynix paid out $300m and $185m to settle price-fixing charges from the US Justice department. The two companies, and seven others, were hit with fines totalling €331m from the EU commission in 2010 for price fixing between 1998 and 2002.

\*   \*   \*

Kim Young-woo, an analyst at SK Securities, said Beijing could impose fines of more than $2.5bn on each of the three chipmakers in the worst-case scenario if they are found to have fixed prices.

"This would create additional pressure to cut DRAM prices and build more wafer factories as joint ventures with local Chinese companies to spur the transfer of technology to China," he said.

168.   Following publication of this article, Micron's stock price fell drastically, from $39.44 at close on Friday, November 16, 2018 to $36.12 at close on Monday, November 19, 2018, a drop of more than 8%.

169.   Defendants caused the Company to file its 2018 Proxy Statement with the SEC on December 6, 2018. Defendants Bailey, Beyer, Byrne, Johnson, Mehrotra, Mondry, and Switz solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

170.   The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board of Directors has adopted a Code of Business Conduct and Ethics that is applicable to all our directors, officers and employees."

171.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

172.   Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "promote [the Company's] long-term success and shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 45 -

173.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

174.    On December 20, 2018, Defendants caused the Company to make its disclosures for the second quarter of 2019.  Defendants issued financial guidance that was well-below consensus expectations by securities analysts, due to weakening demand for both DRAM and NAND products by several end-markets, including gaming, smartphone, and cloud service providers.  Defendants also disclosed that there was excess inventory in these channels and it would likely take three quarters for the inventory glut to subside.

175.    Accordingly, as a result of defendants' breaches, the Company has been damaged.

**INSIDER SELLING**

176.    During the Relevant Period, while in possession of material adverse non-public information, defendants Switz, Byrne, Bailey, and Mondry sold their personally held Micron stock at inflated prices, reaping millions in profits.

177.    On July 5, 2018, defendant Switz sold 100,000 shares of his personally held Micron stock for over $5.4 million in proceeds.  Even though this trade was made pursuant to a 10b5-1 plan, the trade is suspicious because: (1) the 10b5-1 plan was adopted on May 14, 2018 when Switz was already aware of material adverse non-public information, and (2) it is his ***only***

sale made in Micron stock since 2014.

178.   Defendant Byrne made one sale during the Relevant Period, on May 2, 2018, collecting over $665,000 in proceeds.  This trade was not made pursuant to a director trading plan.

179.   Defendant Bailey made no fewer than nine sales of his personally held Micron stock while in possession of materially adverse non-public information about the Company.  In total, during the Relevant Period, defendant Bailey sold 27,000 shares of Micron stock for proceeds totaling approximately $1.2 million pursuant to a director trading plan.

180.   Defendant Mondry sold 50,000 shares of Micron stock on February 14, 2018 while in possession of material adverse non-public information, reaping over $2.1 million in proceeds.

## DERIVATIVE AND DEMAND ALLEGATIONS

181.   Plaintiff brings this action derivatively in the right and for the benefit of Micron to redress the breaches of fiduciary duty and other violations of law by Defendants.

182.   Plaintiff will adequately and fairly represent the interests of Micron and its shareholders in enforcing and prosecuting its rights.

183.   The Board currently consists of the following eight (8) directors: defendants Switz, Mehrotra, Bailey, Beyer, Byrne, and non-parties Steven J. Gomo, Mary Patrice McCarthy and MaryAnn Wright.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, because at least half of the Board could not independently or disinterestedly evaluate a demand.  This is true for the following reasons:

a.  During the Relevant Period, defendants Bailey, Byrne and Switz served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Critically, the Audit Committee was also responsible for the Company's compliance with legal and regulatory requirements. Defendants Bailey, Byrne and Switz breached their non-exculpable fiduciary duties of loyalty and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Bailey, Byrne and Switz each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

b.  The principal professional occupation of defendant Mehrotra is his employment with Micron as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on December 6, 2018, Defendants have admitted that defendant Mehrotra is not independent. Thus, defendant Mehrotra lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.  Defendants Bailey, Beyer, Byrne, Switz (half of the Board) signed the false and misleading 2016 Form 10-K. The 2016 Form 10-K was false and misleading because (among other things) it failed to disclose the Company's massive anti-competitive behavior and made false and contained misleading statements regarding the Company's internal controls. Therefore, defendants Bailey, Beyer, Byrne, Switz each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

d.  Defendants Mehrotra, Bailey, Beyer, Byrne and Switz (a majority of the Board) signed the false and misleading 2017 Form 10-K. The 2017 Form 10-K was false and misleading because (among other things) it failed to disclose the Company's massive anti-competitive behavior and made false and contained misleading statements regarding the Company's internal controls. Therefore, defendants Mehrotra, Bailey, Beyer, Byrne and Switz each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

e.  Defendants Mehrotra, Bailey, Beyer, Byrne and Switz (a majority of the Board) signed the false and misleading 2018 Form 10-K. The 2018 Form

10-K was false and misleading because (among other things) it failed to disclose the Company's massive anti-competitive behavior and made false and contained misleading statements regarding the Company's internal controls. Therefore, defendants Mehrotra, Bailey, Beyer, Byrne, and Switz each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

f. Bailey, Byrne, and Switz collectively received proceeds of over $7.2 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. At the time of the trades, Bailey, Byrne, and Switz were in possession of material adverse non-public information about the Company's anti-competitive tactics. Therefore, demand in this case is futile as to them, and thus excused.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185. As alleged in detail herein, each of the Defendants had a duty to ensure that Micron disseminated accurate, truthful and complete information to its shareholders.

186. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Micron shareholders materially misleading and inaccurate information through, inter alia, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

187. The Defendants also had a duty to ensure that Micron did not engage in illegal conduct. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to engage in the illicit price-fixing scheme.

188. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

## AGAINST BAILEY, BYRNE, MONDRY AND SWITZ FOR INSIDER SELLING

189.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

190.    At the time of each of the stock sales set forth above, Bailey, Byrne, Mondry and Switz knew, but did not disclose publicly, that the Company was involved in an anticompetitive price-fixing scheme.  Bailey, Byrne, Mondry and Switz made each of the stock sales described herein on the basis of and because of their knowledge of the material, non-public information described herein.

191.    Further, at the time of their stock sales, Bailey, Byrne, Mondry and Switz knew that when the Company's scheme was finally reported, the price of the Company's common stock would dramatically decrease. Bailey, Byrne, Mondry and Switz's sales of Micron common stock based on their knowledge of this material non-public adverse information was a breach of their non-exculpable fiduciary duties of loyalty and good faith.

192.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT III

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Micron.

195.    Plaintiff, as a shareholder and representative of Micron, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### COUNT IV

### AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

198.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

199.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. §240.14a-9.

200. Under the direction and watch of the Directors serving on the Board during the issuance of the 2017, and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls.

201. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "promote [the Company's] long-term success and shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

202. The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

203. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements

contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

204.    The false and misleading elements of the Proxy Statements led to the re-election of defendants Mehrotra, Bailey, Beyer, Byrne, and Switz, which allowed them to continue breaching their fiduciary duties to Micron.

205.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

206.    Plaintiff on behalf of Micron has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Micron to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C. Awarding to Micron restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 28, 2019

**GILES AND THOMPSON LAW, PLLC**

*/s/ Jason S. Thompson*

Chip D. Giles, ISB #9135
chip@gtidaholaw.com
Jason S. Thompson, ISB #8985
jason@gtidaholaw.com
350 N. 9th Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 342-7880
Facsimile: (208) 947-2424

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305

*Counsel for Plaintiff*

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL- 54 -

## **VERIFICATION**

I, Karen Sbriglio, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED:

Karen Sbriglio